## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

**ROBERT L. BRYANT**,

> Petitioner,

v.                                          No. CIV 11-0197 RB/LFG

**GUADALUPE COUNTY CORRECTIONAL FACILITY**
**and Erasmo Bravo, Warden,**
**Department of Corrections of the State of New Mexico**,

> Respondents.

## MAGISTRATE JUDGE'S FINDINGS
## AND RECOMMENDED DISPOSITION[1]

### Findings

1.    On March 3, 2011, Robert Bryant ("Bryant") filed his *Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody*, in which he raises six grounds for relief. [Doc. 1].   Respondents filed their *Answer* on May 23, 2011, conceding that Bryant exhausted, through state-court proceedings, the claims he asserts here. [Doc. 7 at 7].   Bryant filed his federal petition the day after the New Mexico Supreme Court issued its *Order* denying his petition for writ of *certiorari* under Rule 12-501 of the New Mexico Rules of Appellate Procedure, and there is no argument as to the timeliness of the petition.

---

[1] Within 14 days after a party is served with a copy of these findings and recommendations, that party may, pursuant to 28 U.S.C. § 636(b)(1), file written objections to such findings and recommendations.  A party must file any objections with the Clerk of the U.S. District Court within the 14-day period allowed if that party wants to have appellate review of the findings and recommendations. If no objections are filed, no appellate review will be allowed.

2.    Bryant currently is confined at the Guadalupe County Correctional Facility, where he is serving a total term of incarceration of life plus 40 years and 6 months.  He was found guilty in a jury trial (State of New Mexico v. Robert Bryant, No. CR 1998-00588) of murder in the first degree, a capitol felony offense (Count I); kidnaping, a first degree felony offense (Count II); criminal sexual penetration, a first degree felony offense (Count III); and tampering with evidence, a fourth degree felony offense (Count IV). [Doc. 7 at 2].

3.    The *Judgment and Sentence and Commitment* was entered in the First Judicial District Court, County of Santa Fe, State of New Mexico, on November 1, 1999. [Doc. 7; Exh. A].

4.    As grounds for federal review, Bryant asserts that:

a.    he possesses newly discovered evidence demonstrating that he did not commit the crimes for which he was convicted (Ground One). [Doc. 1 at 9-31];

b.    the state trial court denied him his constitutional right to call witnesses on his behalf when it prevented him from presenting the expert testimony of Dr. Karen Griest, a pathologist who would have testified on matters relating to the victim's time of death (Ground Two). [Id. at 33-34];

c.    the trial court erred in its admission of expert testimony on the issue of hair transfer (Ground Three). [Id. at 34-35];

d.    the trial court erred in admitting evidence tending to show that Bryant played loud music, fought with his girlfriend and his landlady, and became upset when others parked in his assigned parking spot at his apartment complex (Ground Four). [Id. at 35-36];

2

     e.     the trial court erroneously denied his motion for mistrial following the government's alleged remarks on Bryant's Fifth Amendment right to remain silent (Ground Five) [Id. at 37]; and

     f.     the cumulative impact of all of these errors was so prejudicial as to deny Bryant the right to a fair trial (Ground Six) [Id. at 38].

5.     Bryant is represented here by Gary C. Mitchell, Esq., who also represented him throughout the course of the state court proceedings, both criminal and civil (*habeas*). [Id. at 40; see also Doc. 7; Exhs. S, T].

### Factual Background

6.     On March 5, 1998, Reymunda Baca's body was found in the camper shell-covered bed of Robert Bryant's pickup truck, which at that time was located on Bryant's father's property in Tesuque, New Mexico.  Ms. Baca was naked from the waist down, except for tennis shoes.  Her bra was cut in the middle and pushed up. [Doc. 7; Exh. E at 10-11].  There were numerous injuries to Ms. Baca's body, including bruising of and internal hemorrhaging into her neck muscles, windpipe, and esophagus.  There were petechial hemorrhages in both eyes, as well as injuries and bruises to Ms. Baca's head, face, stomach, arms, fingers, legs, and feet. [Id.; Exh. E at 11-12].  Ms. Baca was wrapped in a comforter depicting the cartoon cat, Garfield, and her comforter-wrapped body was, in turn, covered by a Native American patterned rug. [Id.; Exh. Q at 31].  A rope was wound around the body and was tied to the bumper of the pickup. [Id.; Exh. D at 26].

7.     Ms. Baca's body was found by Bryant's brother, Charles Bryant, Jr., who forced open the camper portion of the truck to retrieve tools and equipment that were inside.  The forced opening was necessary because the camper was padlocked. [Id.; Exh. E at 10].  Charles

Bryant, Jr. reported the discovery of the body to his father, Charles Bryant, Sr., who called

a family attorney, Robert Cole.  Mr. Cole came to Tesuque the next day, March 6, 1998, and

upon seeing Ms. Baca's body in Bryant's pickup, contacted the police, who towed the truck

to the Department of Public Safety ("DPS") where they finally removed Ms. Baca and

inventoried the vehicle.  During the inventory, officers found, among other things, a

backpack containing a set of keys to the truck and the padlocks that secured the camper

shell.  [Id.; Exh. E at 10-11].

8.      Before the truck (with Ms. Baca's body inside) was towed to the DPS, however, Ms. Baca's

body was observed at Tesuque by Senior Deputy Medical Investigator Dave Clendenin, who

described it as being very cold to the touch and in a state of full and complete *rigor mortis*.

According to Investigator Clendenin, *rigor mortis*, or the stiffening of muscles, usually

occurs within 24 to 36 hours after death.  [Doc. 1 at 19-20].

9.      An autopsy conducted on March 7, 1998 concluded that the cause of Ms. Baca's death was

strangulation.  [Doc. 7; Exh. E at 11].

10.     The autopsy also revealed the presence of sperm, with intact heads and tails, in Ms. Baca's

vaginal canal. [Doc. 1 at 20; Doc. 10 at 5].

11.     Although Bryant lived with his girlfriend, Margo Salazar, and her two sons in Albuquerque,

his truck was at his father's home in Tesuque on March 5, 1998 because it was impounded

due to Bryant's arrest for driving while intoxicated ("DWI") on February 20, 1998.  Rather

than taking it to an impound lot, the tow truck driver agreed to tow the vehicle to the father's

residence in Tesuque.  [Doc. 7; Exh. E at 7, 9, 12].

12.     It is undisputed that from February 20, 1998 through March 5, 1998, the day Ms. Baca's body was found, Bryant was incarcerated at the Santa Fe County Detention Center.  [Id.; Exh. D at 24].

13.     While Bryant denied knowing how Ms. Baca's body got in his truck, [id.; Exh. E at 14],  he did not deny knowing Ms. Baca.

14.     In fact, the record evidence reveals that Bryant and Ms. Baca engaged in sexual encounters on February 2 and 3, 1998 at the Bow and Arrow Lodge in Albuquerque when Ms. Baca offered to trade sex for drugs that Bryant was tasked with selling for drug dealers to whom he owed $7,500.  [Id.; Exh. E at 14].

15.     Instead of selling the 30 rocks of crack cocaine in his possession, however, Bryant and Ms. Baca (along with a friend of Ms. Baca) smoked approximately two-thirds of the crack cocaine and Bryant and Ms. Baca "had sex throughout all the next day until evening."  [Id.; Exh. E at 14].

16.     Upon their return to the Bow and Arrow Lodge, the dealers were "perturbed" to learn that Bryant had used the room for sex, as well as his personal consumption—rather than sale—of the crack cocaine.  According to Bryant, the dealers then hit Ms. Baca on the head and fired shots at Bryant as Bryant ran out of the room.  Bryant states that this was the last time he saw Reymunda Baca.  [Id.; Exh. E at 14-15].

17.     While friends and acquaintances reported seeing Ms. Baca as late as February 12, 1998, her mother, who last spoke to her daughter on January 20, 1998, filed a missing persons report on February 16, 1998.  [Id.; Exh. D at 28; Exh. L at 5].

**Procedural History**

18.     Bryant was indicted on July 30, 1998, and his attorney, Gary Mitchell, entered an appearance on August 21, 1998. [Id.; Exh. S at 67].

19.     As is relevant here, the trial court ordered the defense to submit its witness list by June 30, 1999, and Mr. Mitchell, on Bryant's behalf, did so. [Id.; Exh. E at 22].

20.     Bryant's June 30, 1999 witness list included the following three expert witnesses: Alison Galloway, a forensic pathologist; and David Faulkner and Neal Haskell, forensic entomologists. [Id.; Exh. E at 22; Exh. S at 62].

21.     Neal Haskell's specialty, as described by Bryant, is "the examination of human remains and determining the time of death based upon insect activity in and around the human remains." [Id.; Exh. D at 38].

22.     On August 26, 1999, 12 days before trial, Mr. Mitchell filed a document entered on the state court docket as *Defendant's Trial Witness List*, [id.; Exh. S at 61], which included the above-named three expert witnesses plus Dr. Mike Doberson, another forensic pathologist. [Id.; Exh. E at 22].

23.     Finally, on August 30, 1999, 7 days before trial, Mr. Mitchell filed *Defendant's Supplemental Trial Witness List*, [id.; Exh. S at 61], which, for the first time, sought to include a fifth expert witness, Karen Griest, another forensic pathologist.

24.     Notwithstanding that he named three forensic pathologists, Bryant contends that "the two (2) pathology experts [he] was actually calling regarding the time of death were Dr. Doberson and Dr. Griest." [Id.; Exh. F at 5].

25.     Jury selection was scheduled to begin on September 7, 1999.  However, as of August 30, 1999, Bryant had not provided contact information or telephone numbers for the defense

experts, nor had Bryant tendered any *curricula vitae* for them, and made no background information available for the proposed new experts. [Id.; Exh. E at 23].

26.   As of that point in time, Mr. Mitchell had sent photographs and Ms. Baca's autopsy report only to Dr. Doberson, and did not have any of his experts prepare reports because he did not know if he was going to call them. [Id.; Exh. E at 23].

27.   Objecting to the possibility of having "to spend substantial time at this late date to find out about experts that might have to be challenged or impeached without even knowing if the witnesses were going to testify[,]" the state moved to strike Dr. Griest on grounds that (1) all of Bryant's experts were to testify on the issue of how to age bodies, and (2) Dr. Griest was added just one week before trial was to start. [Id.; Exh. E at 23].

28.   Mr. Mitchell explained the untimely addition of Dr. Griest.  According to Mr. Mitchell, (1) inadequate finances; (2) the state's failure to provide the defense with the autopsy photographs; and (3) Mr. Mitchell's inability to obtain the photographs from the Office of the Medical Investigator ("OMI") prevented him from disclosing Dr. Griest sooner. [Id.; Exh. D at 45; Exh. F at 5].

29.   According to Mr. Mitchell, while the state obtained the autopsy photographs from the OMI, the state, "not want[ing] to go to the expense of spending Six Hundred Dollars ($600.00) to make a duplicate set of photographs[,]" told defense counsel that the photographs from OMI "cost too much and [that Mr. Mitchell should] get his own photographs." [Id.; Exh. D at 45].

30.   Mr. Mitchell explained that he ordered the autopsy slides from the OMI and ultimately was forced to threaten the OMI with a subpoena duces tecum. [Id.; Exh. D at 45-46].

31.   Walter Maestas, the OMI's records manager, "confirmed that he had been contacted by Defense Counsel's office on June 25, 1999, regarding the pictures and that in fact he had

7

received a letter *in August*." [Id.; Exh. D at 46 (emphasis added)].  This was so even though

trial originally was set to begin on July 20, 1999.  [Id.; Exh. S at 62].

32.     In any event, once Mr. Mitchell received the slides, he "immediately" sent them to Dr.

Doberson, following which Mr. Mitchell "had to try to get them back [from Dr. Doberson]

in order to get them to" Dr. Griest, which he was able to do. [Id.; Exh. D at 46].

33.     Respondents contend—and Mr. Mitchell does not dispute—that in a colloquy over the

proffered expert witnesses, "[t]he court asked defense counsel if there was a problem with

Dr. Doberson, or if he had a different area of expertise than Dr. Griest, and *defense counsel*

*stated that they were both pathologists with the same expertise when it came to trying to age*

*bodies*." [Id.; Exh. E at 23-24 (emphasis added)].

34.     Respondents continue:

> The trial court told defense counsel that unless he gave the court a
> reason, the trial court was going to strike Dr. Griest from the witness
> list.  Defense counsel gave no reply, gave no reason why Dr. Griest
> should be retained on the list.  The trial court then struck her from the
> witness list.  Defense counsel said only that if his client was
> convicted, he might want to call Dr. Griest at the sentencing phase.

[Id.; Exh. E at 24; see also Doc. 13; record of proceedings in State v. Bryant, No. SF 98-588 CR,

"Status Conference" of 9/7/1999 at 23-24].

35.     At trial, attempting to establish time of death—or at least a possible range of times—was

critical, because Ms. Baca's body was found on March 5, 1998, but Bryant was incarcerated

on that date, and had been since February 20, 1998. [Doc. 1 at 10].

36.     To that end, Dr. Haskell, having been qualified as an expert in forensic entomology,

testified, in pertinent part, that he reviewed temperature charts for the area in question for

the times in question, and concluded that, on the basis of that data, there should have been

8

evidence of blowfly activity in the pickup truck had Ms. Baca's body been in the truck the entire time between February 20, 1998 and March 5, 1998.[2]  However, having reviewed photographs of Ms. Baca's body, the pickup truck, and the blankets found with the body, Dr. Haskell could see no evidence of blowfly activity, which caused him to conclude that Ms. Baca's body was not in Bryant's pickup truck for the entire period between February 20, 1998 and March 5, 1998.  [Doc. 7; Exh. D at 38-39].

37.     Dr. Haskell testified that the wrapping of Ms. Baca's body in blankets might explain the absence of blowfly colonization, but it did not explain the absence of blowflies in the back of the pickup truck. [Id.; Exh. E at 35].

38.     On redirect examination, Dr. Haskell explained that, although he saw no report of Ms. Baca's body being frozen, he had conducted experiments that involved the freezing of dead pigs, and that these experiments demonstrated that there was an initial delay in blowfly colonization when the corpses were removed from the freezer. [Id.; Exh. D at 35].

39.     By contrast, Senior Medical Investigator Clendenin opined that Ms. Baca's body might have been frozen "because it was very, very cold to the touch." [Doc. 13; record of proceedings in State v. Bryant, No. SF 98-588 CR, Vols. III and IV at 113].

40.     Forensic microanalyst Philip Avilas testified as an expert on hair evidence.  He analyzed nine hairs found on Ms. Baca's body, her clothes, and the Garfield comforter and Indian blanket in which she was wrapped and, after having examined the hairs under a microscope

---

[2]  Blowflies (or Calliphoridae) are considered a valuable tool in forensic science because they usually are the first insects to come in contact with a dead body, at which point females deposit eggs onto the body.  Since development is highly predictable if the ambient temperature is known, blowfly activity can assist forensic entomologists in generating an accurate approximate time of death.  See http://en.wikipedia.org/wiki/Calliphoridae (last visited Sept. 26, 2011).

that magnified them 200 to 400 times, he concluded that those hairs displayed characteristics similar to Bryant's hair.  [Doc. 7; Exh. E at 13].

41.   Mr. Avilas also testified that in his investigative experience, hair transfers occurred in less than 1/2 of 1 percent of all sex crimes, and that he worked on approximately 250 such cases per year, over a 14-year period. [Doc. 1 at 34-35; Doc. 7; Exh. D at 31].

42.   Defense counsel made a <u>Daubert</u>-type objection to this testimony, but his objection was overruled. [Doc. 7; Exh. D at 31].

43.   DNA expert Susan Scholl testified that of the nine hairs found in and around Ms. Baca's body, one yielded conclusive DNA results, from which she determined, to a reasonable degree of scientific certainty, that the hair was that of Robert Bryant. [<u>Id.</u>; Exh. E at 13-14].

44.   Susan Scholl also determined, to a reasonable degree of scientific certainty, that semen found inside Ms. Baca was that of Robert Bryant. [<u>Id.</u>; Exh. E at 14].

45.   Dr. Patricia McFeeley is a forensic pathologist with the OMI who testified on September 23, 1999  on behalf of the state during its case-in-chief. [<u>Id.</u>; Exh. E at 25; Exh. F at 5].

46.   Although Dr. McFeeley did not conduct or participate in the autopsy on Ms. Baca, she reviewed the autopsy report and testified as to her conclusion that the evidence could have been consistent with Reymunda Baca's death having occurred early in February, rather than within the hours or days preceding the discovery of her body. [<u>Id.</u>; Exh. D at 39].

47.   Dr. McFeeley's conclusion was based, in part, on her interpretation of the autopsy report's findings vis-à-vis the decompositional nature of Ms. Baca's internal organs, specifically the pancreas; myocardium (the muscular tissue of the heart); and abdomen.   According to Dr. McFeeley, the condition of these organs was such that she could not say that it was only days from death to discovery of Ms. Baca's body. [<u>Id.</u>; Exh. E at 32-33].

48. Dr. McFeeley stressed, however, that "you have to be careful in making an estimate of time after death, certainly just based on decomposition. I think that can be very risky because we know that can be quite variable." [Doc. 13; record of proceedings in State v. Bryant, No. SF 98-588 CR, Vols. III and IV at 283].

49. Dr. McFeeley also testified as to the presence of intact sperm in Ms. Baca's vaginal canal, explaining that the OMI will call a specimen "positive for sperm" only if there is a head and tail attached. [Doc. 13; record of proceedings in State v. Bryant, No. SF 98-588 CR, Vols. III and IV at 267]. Dr. McFeeley noted that semen decomposes as a corpse decomposes, and that the presence of intact sperm in this case was not incompatible with Ms. Baca having been dead for two to four weeks, since the events in question occurred in the winter months in northern New Mexico. [Doc. 7; Exh. E at 12].

50. As Dr. McFeeley explained, "[i]n a dead person, assuming that they are staying in that position and that the body cools, then [sperm] can be there for an extended period, [much] longer than you would expect in a live person." [Doc. 13; record of proceedings in State v. Bryant, No. SF 98-588 CR, Vols. III and IV at 331].

51. On the topic of body position, Bryant elicited from Dr. McFeeley testimony that Ms. Baca's body might have been moved *after* she was killed, based on what appeared to be *livor mortis*, or the post-mortem pooling of blood, in two different areas of Ms. Baca's body. [Doc. 13; record of proceedings in State v. Bryant, No. SF 98-588 CR, Vols. III and IV at 326-329].

52. In offering opinions on *rigor mortis*, Dr. McFeeley testified that the condition usually sets in within a few hours of death and reaches its maximum state 12 to 24 hours after death, although variables such as temperature and environment can affect the rate at which *rigor*

*mortis* becomes full and complete.  Dr. McFeeley emphasized that once *rigor mortis* sets in or begins, the amount of time it takes to become fixed, or how long it will last, "can be quite variable."  [Doc. 13; record of proceedings in <u>State v. Bryant</u>, No. SF 98-588 CR, Vols. III and IV at 305].  Additionally, explained Dr. McFeeley, *rigor mortis* is just one factor that the OMI uses in attempting to determine time of death, and uses in a context, because *rigor mortis* "by itself, is not very reliable."  [Doc. 13; record of proceedings in <u>State v. Bryant</u>, No. SF 98-588 CR, Vols. III and IV at 303].

53.   Accordingly, while the state's theory of the case was that Bryant killed Ms. Baca sometime between February 9 to 12, 1998 (the time she was last reported seen) and February 20, 1998 (the date of Bryant's DWI arrest), [Doc. 7; Exh. E at 15-16], Bryant's theory was that the drug dealers who became irate and assaulted him and Ms. Baca at the Bow and Arrow Lodge early in February 1998 killed Ms. Baca, then kept her body in a location cold enough to retard decomposition before placing the body in the bed of his truck. [<u>Id.</u>; Exh. F at 12].

54.   Thus, in light of the defense theory of the case, and given his belief that Dr. McFeeley's testimony "deviate[d] from what the medical literature showed, what the scientific community knew and from the scientific principles of pathology[,]" [<u>id.</u>; Exh. F at 7-8], Mr. Mitchell, on September 27, 1999, with Bryant as the only remaining witness left to testify, moved the court to reconsider its order excluding Dr. Griest from testifying, and asked that he be allowed to call her the next day. [<u>Id.</u>; Exh. E at 25].

55.   According to Mr. Mitchell, he "brought Dr. Griest back into the trial *only* after Dr. McFeeley . . . went far beyond the autopsy report . . . and gave opinions which were contradicted by the medical literature and would have been contradicted by . . . Dr. Griest." [<u>Id.</u>; Exh. F at 5 (emphasis in original)].  Specifically, counsel believed that Dr. Griest would have refuted

12

(1) Dr. McFeeley's interpretation of the findings included in the autopsy report; (2) Dr. McFeeley's opinions on *rigor mortis*, organ decomposition, and length of time sperm can remain intact; and (3) any implication that Ms. Baca's body was frozen.

56.    Calling the state's theory "scientifically implausible, improbable and virtually impossible," Mr. Mitchell argued that

> [t]he bottom line is that Dr. Griest would have supported the defense theory that [Ms. Baca's] body could not have been in Robert Bryant's vehicle the day he was arrested, that in fact the only way from a medical and scientific point of view that the body would have been in the state it was when autopsied was by the body remaining below a certain temperature from the time of death until the time of autopsy, which precluded the body being in the vehicle at the time Mr. Bryant was arrested.

[Id.; Exh. F at 7].

57.    In response to questions posed by the trial court, Mr. Mitchell stated that he originally thought that Dr. Griest's testimony would be repetitive of that provided by Dr. Doberson, but that he did not have Dr. Doberson available on such short notice, whereas Dr. Griest was available. [Id.; Exh. E at 25].

58.    At that point, the prosecuting attorney stated that

> she had contacted Dr. Doberson *before* Dr. McFeeley had testified, and that *Dr. Doberson already knew at that time that he was not being called by the defense*, which meant that defense counsel knew before the previous week that he was not going to be calling Dr. Doberson, but waited to bring this up until just before calling the defendant, the last defense witness.

[Id.; Exh. E at 25 (emphasis added)].

59.    Mr. Mitchell did not deny that he called off Dr. Doberson before Dr. McFeeley testified. [Doc. 13; record of proceedings in State v. Bryant, No. SF 98-588 CR, Vol. VI at 156-157].

60.    The trial court denied Mr. Mitchell's motion for reconsideration. [Id.; Exh. E at 25-26].

61.     The court expressed concern as to why Dr. Doberson, the original defense pathologist, was

        now unavailable, and told Mr. Mitchell that

> it appears . . . that you've created a scenario where you would like to
> create an issue that the state or that the court is denying you the
> ability to put an expert on to contest these issues, when, in fact
> you've created a situation where the expert that you were allowed
> now, at the time of trial, is unavailable, knowing and only after
> knowing, that the court had excluded the other possibility.

[Id.; Exh. E at 26].

62.     Notwithstanding Mr. Mitchell's earlier, pretrial representation to the court that Drs. Griest

        and Doberson "were both pathologists with the same expertise when it came to trying to age

        bodies[,]" [id.; Exh. E at 23-24], Mr. Mitchell changed his representation and now insisted

        that

> [t]he  defense absolutely needed Dr. Griest to testify in order to show
> to the jury from a scientific and medical basis this body could not
> have been in the pickup when Mr. Bryant was arrested and therefore
> someone had to place the body in the pickup after he was arrested
> and very close to the day the body was found.

[Id.; Exh. F at 9].

63.     Numerous lay witnesses, including Bryant's father; brother; girlfriend; some of his

        acquaintances; the police officer who arrested Bryant for DWI the night of February 20,

        1998; and the tow truck driver who initially removed the impounded truck and then towed

        it to the property of Bryant's father, testified that they worked on or otherwise came into

        contact with Bryant's truck between February 20, 1998 and March 4, 1998 and that they

        neither saw nor smelled a body inside, and that they saw no rope.  [Id.; Exh. D at 24-27].

64. However, Bryant's girlfriend, Margo Salazar, testified that she had bought Garfield comforters for the twin beds in her sons' room, and that one went missing in February 1998. [Id.; Exh. D at 12].

65. Robert Bryant testified that he was a heavy-equipment operator with a longstanding drug problem, particularly cocaine. [Id.; Exh. D at 32].

66. Bryant testified that in an effort to settle a drug debt with his dealers, he offered them his truck.  Accordingly, these individuals knew his truck, had seen pictures of the truck, and were aware that it generally was located in Tesuque. [Id.; Exh. D at 32].

67. Testimony from Bryant that he knew Reymunda Baca as "Pooh" the night they engaged in sex at the Bow and Arrow Lodge, and only learned her real name during the course of the murder investigation, suggested that he and Ms. Baca had not met before February 2, 1998. [See id.; Exh. D at 33].  But Bertha Vigil, the grandmother of Ms. Baca's friend, Cindy Vigil, and in whose home Ms. Baca stayed from late 1997 until February 1998, testified that Bryant came to her house three times looking for Ms. Baca, which frightened Ms. Baca. [Id.; Exh. D at 7].

68. On October 1, 1999, the jury returned a verdict finding Bryant guilty as charged. [Id.; Exh. A at 1].

69. On November 1, 1999, the *Judgment and Sentence and Commitment* was entered.  Bryant was sentenced to a total term of life imprisonment plus 40 years and 6 months. [Id.; Exh. A at 3].

70.   On November 24, 1999, Bryant filed his *Amended Notice of Appeal* to the New Mexico

Supreme Court,[3] [id.; Exh. B], and, on June 22, 2000, he filed his *Brief-in-Chief*, raising the

following six issues:

a.     he was denied his constitutional right to call witnesses to testify on his behalf when

he was prevented from calling Dr. Griest;

b.     the trial court erred in admitting Philip Avilas's expert testimony on hair transfer;

c.     the trial court erred in admitting evidence that Bryant played loud music, engaged

in loud arguments with his girlfriend, and became upset when others parked in his

assigned parking space;

d.     given the insufficient evidence presented, the trial court erred in denying Bryant's

motion to direct a verdict on all counts;

e.     the trial court erred in failing to grant a mistrial when the prosecutor commented on

Bryant's silence; and

f.     the cumulative error resulting from all of the above (a.-e.) led to an unfair trial.

[Id.; Exh. D at 17].

71.   In a decision filed December 4, 2001, the New Mexico Supreme Court affirmed the trial

court in its entirety. [Id.; Exh. G].

72.   As is relevant here, the state supreme court held that the trial court's exclusion of Dr. Griest

was appropriate under the particular circumstances presented, agreeing with the trial court's

assessment that Mr. Mitchell's actions concerning Drs. Griest and Doberson were taken in

an effort to gain a tactical advantage. [Id.; Exh. G at 22].

---

[3]  See State v. Ramirez, 254 P.3d 649, 650 (N.M. 2011) (in New Mexico, an appeal from a
judgment imposing a life sentence is directly to the state supreme court).

73.   Next, the supreme court rejected Bryant's argument that Philip Avilas was not qualified to give statistics on the percentage of hair transfer in sex crimes, explaining that "[t]he fact that [Avilas] was not a recognized expert in statistics was a matter for cross-examination by [Bryant] and went to the weight and effect the fact finder chose to place on his testimony." [Id.; Exh. G at 23].

74.   The supreme court refused to review for error the admission of evidence that Bryant played loud music and argued loudly with his girlfriend on the ground that testimony in those areas was not objected to at trial and, therefore, not preserved for appeal. [Id.; Exh. G at 6]. The court held that the trial court did not abuse its discretion in admitting testimony that Bryant became upset when his assigned parking space was used by others, explaining that such evidence was relevant to show the working condition of Bryant's pickup truck and to counter Bryant's argument that his truck was largely inoperable. [Id.; Exh. G at 6].

75.   The supreme court then addressed Bryant's argument that the prosecutor improperly commented on his right to remain silent in stating that Bryant, whose position was that irate drug dealers used a second set of keys to unlock his truck and leave Ms. Baca's body inside, never mentioned a second set of keys when speaking to police or the tow truck driver about the items inventoried from his pickup. The court concluded that Bryant's omission from a statement he otherwise was affirmatively making was not the type of silence that is constitutionally protected. [Id.; Exh. G at 28-29].

76.   Finally, because the court was unable to say that the trial court committed individual errors, it rejected Bryant's argument that cumulative error so infected the proceedings as to deprive him of a fair trial. [Id.; Exh. G at 11-12].

77.   The mandate was filed on December 26, 2001. [Id.; Exh. H].

17

78.   On December 3, 2002, Bryant filed his state-court *Petition for Writ of Habeas Corpus.* [Id.; Exh. I].

79.   In addition to raising the same six issues set forth above in paragraph 70(a)-(f), Bryant claimed that he obtained evidence that was unavailable at trial, namely an "in-depth detailed scientific study, examination and investigation" showing that Ms. Baca's body could not have been in his pickup truck for the length of time the state argued and the jury believed. [Id.; Exh. I at 33].  According to Bryant, "[a] scientific study conducted by a pathologist and a forensic entomologist conclude[d] beyond a reasonable scientific certainty" that had Ms. Baca's body been in the pickup truck for the entire period between the date of his arrest (February 20, 1998) and the date of its discovery (March 5, 1998) it simply would not have been in the condition it was in when found. [Id.; Exh. I at 33].

80.   The pathologist and entomologist to whom Bryant referred were, respectively, Dr. Griest and Dr. Haskell, [id.; Exh. L at 12-13], and they conducted an experiment in March 2000 ("the 2000 experiment") using dead pigs to simulate the conditions under which Ms. Baca's body was believed to have been left and then discovered.[4]  Their goal was to see if some anomaly would have explained, among other things, why, if Ms. Baca's body were in Bryant's pickup for the length of time alleged by the state, there would have been no blowfly activity of any sort. [Id.; Exh. L at 13-16].

81.   In its response to the petition, the state argued that Bryant's newly discovered evidence was more properly characterized as newly *created* evidence, and that, in any event, the issue of

---

[4]  Bryant states that a pig is "the closest mammal that science can obtain to duplicate and replicate human death and decomposition and [is] duplicative of a human for blowfly activity as well." [Doc. 7; Exh. L at 14].

body decomposition, the very topic on which Dr. Haskell testified at trial, was not the sort of new evidence contemplated by rules or case authority. [Id.; Exh. J at 51].

82. On October 4 and 5, 2010, the state court held an evidentiary hearing on Bryant's *habeas* petition, with both Dr. Haskell and Dr. Griest testifying on his behalf. [Id.; Exh. O; see also Doc. 13; record of proceedings in State v. Bryant, No. SF 98-588 CR, CD of 10/4/10 and 10/5/10 evidentiary hearing].

83. Among other things, Dr. Griest provided opinions on the vaginal swabs taken from Ms. Baca during the autopsy.  Dr. Griest was questioned as to how rapidly heads and tails fall off sperm.  When asked if anything in the medical literature indicated that heads and tails would be present after 14 days (the amount of time between Bryant's DWI arrest on February 20, 1998 and Ms. Baca's autopsy on March 7, 1998), she replied, "absolutely not," and further explained that "they [heads and tails] fall off fairly quickly; three days is being generous." [Doc. 13; record of proceedings in State v. Bryant, No. SF 98-588 CR, CD of 10/5/10 evidentiary hearing, testimony of Dr. Karen Griest at 10:06:25-10:06:52].

84. The court denied Bryant's petition.  As for the six issues set forth above in paragraph 70( a)-(f), the court held that those claims were already addressed in Bryant's direct appeal and he provided no basis for obtaining *habeas* relief on them. [Id.; Exh. O at 38].

85. The court rejected Bryant's argument that the 2000 experiment constituted newly discovered evidence, explaining that this experiment was nothing more "than a demonstration of what Dr. Haskel testified to *during* trial [and, therefore,] was not newly discovered *since* trial." [Id.; Exh. O at 34 (emphasis added)].

86. Noting that Dr. Haskell authored a 1989 journal article that Bryant relied upon as part of his claim for newly discovered evidence, and that Dr. Haskell testified at Bryant's 1999 trial

"about the very same kind of experiment that Bryant now contend[ed was] newly discovered evidence, the court reasoned that "[c]onducting an experiment based on scientific studies that predated the trial indicate[d] that the experiment could have been conducted prior to the trial and that the experiment results [did] not constitute newly discovered evidence." [Id.; Exh. O at 34].

87.     Accordingly, because (1) in the exercise of due diligence, the results of the 2000 experiment could have been discovered prior to trial; (2) the results were not material; and (3) introduction of the results would have been nothing more than an attempt to impeach or contradict other testimony, the court concluded that Bryant did not satisfy the criteria for obtaining a new trial on the basis of newly discovered evidence. [Id.; Exh. O at 35-36].

88.     As for Dr. Griest, the court would have been "more comfortable" had she been permitted to testify at trial, since "the condition of [Ms. Baca's] body and the time that [Bryant] was incarcerated prior to discovery of the body [were] cause for consideration." [Id.; Exh. O at 37]. Indeed, the court called "most compelling" Dr. Griest's testimony regarding the amount of time that sperm can remain intact. [Id.; Exh. O at 37].

89.     Still, because trial testimony as to the time sperm remains intact was elicited through Dr. McFeeley, the court did not believe that the evidence presented during the hearing on Bryant's *habeas* petition was "so convincing that no reasonable juror would have convicted [him] in light of that evidence." [Id.; Exh. O at 37].

90.     For these reasons, on January 6, 2011, the state court denied Bryant's petition for writ of *habeas corpus*. [Id.; exh. O].

91.     On January 19, 2011, Bryant sought review of the state district court's denial in the Supreme Court of New Mexico. [Id.; Exh. P].

92.   Bryant argued that (1) Dr. Griest's testimony at the evidentiary hearing demonstrated beyond a reasonable scientific certainty that Ms. Baca could not have died before March 1, 1998, because intact sperm could not have been present more than 72 hours after death; (2) given advancements in DNA analysis as of the date of the evidentiary hearing, the most that could be said of the origin of the sperm inside Ms. Baca's body was that Bryant could not be eliminated as a contributor, not that he was the actual contributor; and (3) the results of the 2000 experiment proved that, had Ms. Baca's body been in the pickup truck from as early as February 20, 1998, there would have been blowfly activity. [Id.; Exh. P at 6]. In short, insisted Bryant, the evidentiary-hearing evidence, taken together with the trial evidence, established beyond a reasonable scientific certainty that Ms. Baca was not dead prior to March 1, 1998, meaning that Bryant was innocent. [Id.; Exh. P at 6].

93.   By *Order* entered March 2, 2011, the supreme court denied the petition. [Id.; Exh. R].

94.   On March 3, Bryant, through Mr. Mitchell, filed his *Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody*. [Doc. 1].

## Discussion

## Exhaustion of State Remedies

95.   A federal court may consider a petition for writ of *habeas corpus* only after the petitioner first presents his claims to a state court and exhausts his state remedies, unless "there is an absence of available State corrective process or circumstances exist that render such process ineffective to protect the rights of the applicant." 28 U.S.C. § 2254(b)(1)(A). The exhaustion requirement is satisfied if the federal issue has been properly presented to the highest state court, either by direct review of the conviction or in a post-conviction attack. Dever v. Kan. State Penitentiary, 36 F.3d 1531, 1534 (10th Cir. 1994). The Tenth Circuit also has held that

a state prisoner does not fully exhaust state remedies without timely seeking certiorari review in the state supreme court.  Barnett v. LeMaster, 167 F.3d 1321, 1323 (10th Cir. 1999) (*citing* Dulin v. Cook, 957 F.2d 758, 759 (10th Cir. 1992)); Watson v. State of New Mexico, 45 F.3d 385, 387 (10th Cir. 1995).

96.    In this case, Respondents agree that the claims Bryant raises in his federal petition for *habeas* relief were exhausted through the course of the state court proceedings. [Doc. 7 at 7].

**Deference to State Court Adjudication**

97.    Section 2254(d) of Title 28 of the United States Code was amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which "increase[d] the deference to be paid by the federal courts to the state court's factual findings and legal determinations." Houchin v. Zavaras, 107 F.3d 1465, 1470 (10th Cir. 1997).   Accordingly, if a claim is adjudicated on the merits in state court, federal *habeas* relief may be granted to a petitioner only if he can establish that "the state court decision 'was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or . . . was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.'" Welch v. Workman, 639 F.3d 980, 991 (10th Cir. 2011) (*quoting* 28 U.S.C. § 2254(d)(1)-(2)).

98.    The Tenth Circuit has explained that

> [u]nder § 2254(d)(1), a federal court may grant a writ of habeas corpus only if the state court reached a conclusion opposite to that reached by the Supreme Court on a question of law, decided the case differently than the Supreme Court has decided a case with a materially indistinguishable set of facts, or unreasonably applied the governing legal principle to the facts of the petitioner's case. "Under § 2254(d)(1)'s unreasonable application clause . . ., a federal habeas

22

court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, the application must also be unreasonable." "In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court." AEDPA also requires federal courts to presume state court factual findings are correct, and places the burden on the petitioner to rebut that presumption by clear and convincing evidence.

Sallahdin v. Gibson, 275 F.3d 1211, 1221-22 (10th Cir. 2002) (*citing* 28 U.S.C. § 2254(e)(1)).

99.    Section 2254 sets forth "stringent principles of deference" demanding a presumption that the state court's factual findings are correct unless the petitioner rebuts the presumption by clear and convincing evidence.  Wilson v. Sirmons, 536 F.3d 1064, 1074 (10th Cir. 2008).[5]

100.   If this Court determines that the state court did indeed err, this Court must still determine whether the error amounts to a "structural defect[] in the constitution of the trial mechanism," meaning that harmless-error review is not appropriate.  See Arizona v. Fulminante, 499 U.S. 279, 309 (1991).   If the error does not rise to the level of a structural defect, it is reviewed for harmlessness, with the Court asking whether the error "had substantial and injurious effect or influence in determining the jury's verdict."  Brecht v. Abrahamson, 507 U.S. 619, 623 (1993) (*quoting* Kotteakos v. United States, 328 U.S. 750, 776 (1946)).

101.   A "substantial and injurious effect" exists when the court finds itself in "grave doubt" about the effect of the error on the jury's verdict.  Wilson 536 F.3d at 1074 (internal quotations

---

[5]  By contrast, where the state courts have not reached the merits of a claim, "federal habeas review is not subject to the deferential standard that applies under AEDPA [and i]nstead, the claim is reviewed de novo."  Cone v. Bell, 129 S.Ct. 1769, 1784 (2009).

omitted).   "Grave doubt," in turn, exists when the issue of harmlessness is so evenly

balanced that the Court feels itself in virtual equipoise as to the harmlessness of the error.

Id. (internal quotations omitted).

102.    Finally, "[f]ederal habeas courts do not sit to correct errors of fact or to relitigate state court

trials. Our jurisdiction is limited to ensuring that individuals are not imprisoned in violation

of the Constitution."  Thompson v. Oklahoma,  2000 WL 14404, at *6 (10th Cir. Jan. 10,

2000) (unpublished) (*citing* Herrera v. Collins, 506 U.S. 390, 400 (1993)).

103.    In this case, the Court concludes that each of Bryant's six grounds for federal relief was

adjudicated on the merits in the state court proceedings and, therefore, the Court applies the

"stringent principles of deference" mandated by 28 U.S.C. § 2254(d).

### Ground One: Newly discovered evidence shows and supports Bryant's claim that he did not commit the crimes for which he was convicted

In support of his first ground for relief, Bryant repeats what he argued in his state court

*habeas* petition—that the results of the 2000 experiment conducted by Drs. Haskell and Griest prove

that Ms. Baca could not have been dead before Bryant was arrested and jailed on February 20, 1998

on the charge of driving while intoxicated and, therefore, this newly discovered evidence

demonstrates that he is innocent. [See Doc. 1 at 9-32; Doc. 10 at 3-7].

What Bryant calls his newly discovered evidence derives from what he believes the 2000

experiment proves.  In this experiment, three pigs were killed and then positioned to duplicate what

the state argued befell Reymunda Baca between the date she was reported missing and March 5,

1998, the day her body was discovered.  The first pig was used to simulate what Bryant contends

would have become of Ms. Baca's body had she been dead since February 16, 1998, when her

mother reported her missing.  At the end of the experiment, pig number one gave off a strong smell

24

of decomposition; it was deflated; its skin was wrinkled and slipping; and it exhibited *livor mortis*. Signs of *rigor mortis*, which were observed earlier in the experiment, were gone.  [See Doc. 1 at 25-26].

The second pig was used to duplicate what Bryant believes would have been the condition of Ms. Baca's body had she been killed on February 20, 1998, the day of his DWI arrest and incarceration.  At the end of the experiment involving pig number two, this pig's abdomen was firm and held a small amount of gas, and its  tissues and cavities were dry.  As with pig number one, pig number two exhibited *livor mortis*, but signs of *rigor mortis*, which were observed earlier in the experiment, were gone.  [See Doc. 1 at 26-27].

The third pig was intended to duplicate the condition of Ms. Baca's body had she been placed in Bryant's pickup truck on or about March 1, 1998.  At the end of this experiment, pig number three was bloated and greenish, had a large quantity of gas in its abdomen, and had decomposition fluid in its abdomen and chest.  As with the first and second pigs, the third pig exhibited *livor mortis* but no *rigor mortis*, which was apparent earlier in the experiment. [See Doc. 1 at 27].

The tests with the three pigs were intended to demonstrate that Ms. Baca's body could not have been in Bryant's pickup truck until *after* his DWI arrest on February 20, 1998 because, among other things: (1) Ms. Baca's body was in complete *rigor mortis* when it was found; (2) *rigor mortis* occurs within 24 to 36 hours of death; and (3) as the pigs showed, there was no anomaly at Tesuque that would have prevented the customarily expected setting in of *rigor mortis* or the commencement of blowfly activity. [Doc. 1 at 24-28].

It is Bryant's position that (1) this newly discovered evidence; (2) the discovery of sperm with heads and tails intact inside Ms. Baca's vaginal canal during the autopsy, even though scientific

evidence shows that sperm cannot live more than 72 hours in a dead body; and (3) the absence of any blowfly activity, demonstrate that Ms. Baca was alive at the time Bryant was arrested on February 20, 1998, and he, therefore, is innocent. [See Doc. 10 at 3-7].

A most basic tenet of the American legal system is, of course, that an individual charged with a crime is presumed innocent, and is entitled to hold the government to its burden of proving him guilty beyond a reasonable doubt.  See Herrera v. Collins, 506 U.S. 390, 398 (1993).  However, "[o]nce a defendant has been afforded a fair trial and convicted of the offense[s] for which he was charged, the presumption of innocence disappears."  Id.  In the instant case, a jury found Robert Bryant guilty as charged, [see Doc. 7; Exh. A at 1 ("Defendant having been convicted on October 1, 1999[] pursuant to a jury verdict of GUILTY")], and "[t]hus, in the eyes of the law, [Bryant] does not come before the Court as one who is 'innocent,' but, on the contrary, as one who has been convicted by due process of law of" murder, kidnaping, criminal sexual penetration, and tampering with evidence.  See Herrera, 506 U.S. at 399.  Nevertheless, as explained above, Bryant insists that newly discovered evidence proves his innocence. [Doc. 1 at 9-32; Doc. 10 at 3-7].

Unfortunately for Bryant, "[c]laims of actual innocence based on newly discovered evidence have never been held to state a ground for federal *habeas* relief absent an independent constitutional violation occurring in the underlying state criminal proceeding."  Herrera, 506 U.S. at 400.  The rationale for this rule is that federal *habeas* courts sit to ensure that individuals are not imprisoned in violation of the Constitution—not to correct errors of fact, not to relitigate state trials, and not to re-examine facts establishing guilt.  Id.

At the same time, because *habeas* courts are tasked with ensuring that constitutional errors do not result in the incarceration of the innocent, the Supreme Court has carved out a "fundamental miscarriage of justice" exception to the rule stated above, whereby "a petitioner otherwise subject

26

to defenses of abusive or successive use of the writ may have *his federal constitutional claim* considered on the merits if he makes a proper showing of actual innocence." Herrera, 506 U.S. at 404 (emphasis added). The exception reinforces that an independent claim of "actual innocence" is not recognizable in *habeas* but, rather, may, in some circumstances, serve as "a gateway through which a *habeas* petitioner must pass to have his otherwise barred constitutional claim considered on the merits." Id. In other words, even under the narrow "fundamental miscarriage of justice" exception, "actual innocence" is not considered a stand-alone claim but, instead, must supplement the constitutional claim raised in a successive petition. See Kuhlmann v. Wilson, 477 U.S. 436, 454 (1986) (explaining that "the 'ends of justice' require federal courts to entertain [successive] petitions only where the prisoner supplements his constitutional claim with a colorable showing of factual innocence.").

Such was not the situation for the petitioner in Herrera, nor is it the situation here, where Bryant "does not seek excusal of a procedural error so that he may bring an independent constitutional claim challenging his conviction . . . , but rather argues that he is entitled to habeas relief because newly discovered evidence shows that his conviction is factually incorrect." Herrera, 506 U.S. at 404. Bryant raises a "freestanding claim[] of actual innocence[,]" to which the Supreme Court has never extended the "fundamental miscarriage of justice" exception. Id.

The New Mexico court that considered Bryant's state *habeas* petition did not expressly consider Herrera or other clearly established federal law, as determined by the United States Supreme Court. See Welch, 639 F.3d at 991. Instead, in rejecting Bryant's "newly discovered evidence" argument, the state court relied entirely on state law, *i.e.*, Case v. Hatch, 183 P.2d 905 (N.M. 2008), holding that, having reviewed the record as a whole, including the original evidence and the results of the experiment conducted in 2000 by Drs. Haskell and Griest, the Court was "not

'left with a firm belief that but for the [unavailability of the 2000 experiments at the time of trial, Bryant] would most likely not have been convicted.'" [Doc. 7; Exh. O at 33 (*quoting* Case, 183 P.2d at 911)].  To be sure, state district court Judge Michael Vigil cited to and relied on *only* New Mexico authority in determining that the results of the 2000 experiment (1) were not newly discovered since trial; (2) could, by the exercise of due diligence, have been discovered before trial; (3) were not material; (4) would have done no more than contradict or impeach Dr. McFeeley's testimony that she could not ascertain the time of Ms. Baca's death; and (5) were cumulative of Dr. Haskell's trial testimony inasmuch as the demonstrative showing that there was no blowfly activity around Ms. Baca's body merely illustrated the point to which Dr. Haskell testified at trial. [Id.; Exh. O at 33-36 (*citing* Case, 183 P.2d at 911; Montoya v. Ulibarri, 163 P.3d 476, 486 (N.M. 2007); and State v. Volpato, 696 P.2d 471, 472-473 (N.M. 1985).

As explained more fully above, "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." Estelle v. McGuire, 502 U.S. 62, 68 (1991).  "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."  Id. (federal court exceeded limited scope of federal *habeas* review of state convictions in granting *habeas* relief in part on basis of conclusion that evidence presented against petitioner/defendant was incorrectly admitted pursuant to California law).  Again, Judge Vigil relied entirely on state law in his rejection of Bryant's "newly discovered evidence" argument. [See generally Doc. 7; Exh. O].  This Court has "no authority to review a state court interpretation or application of its own law." Battle v. Sirmons, 304 Fed.Appx. 688, 690 (10th Cir. 2008).  As a result, and also because Bryant does not come within the rule announced in Herrera, the Court concludes that he is not entitled to *habeas* relief with respect to ground one.

**Ground Two: The trial court denied Bryant his constitutional right to call witnesses to testify on his behalf when it prevented Dr. Griest from testifying as a sanction against Mr. Mitchell for the late disclosure**

As his second ground for relief, Bryant contends that, in excluding testimony from Dr. Griest as a sanction against Mr. Mitchell, the trial court deprived him of his constitutional right to call witnesses to testify on his behalf. [Doc. 1 at 33-34; Doc. 10 at 7-10].  Bryant explains that Dr. Griest would have testified as to, among other things, how long sperm with intact heads and tails will remain in a dead body (72 hours at most), as well as on the topics of body decomposition and deterioration. [Doc. 1 at 28-29; Doc. 10 at 10].  Bryant contends that Dr. Griest's expert testimony was absolutely critical and necessary to rebut that of Dr. McFeeley, who offered opinions that were inconsistent with the autopsy report.  Because, explains Bryant, Dr. Griest would have established "beyond a medical certainty" [see Doc. 10 at 10] that Ms. Baca was not dead before he was incarcerated, the exclusion of her testimony was not harmless, nor was it warranted as a sanction for Mr. Mitchell's untimely disclosure of her as a witness. [Id. at 7-10].

This issue was raised and adjudicated during the course of Bryant's direct appeal, [see Doc. 7; Exh. D at 39-42; Exh. F at 5-13; Exh. G at 20-22], with Mr. Mitchell explaining that the reasons he disclosed Dr. Griest after the expiration of his expert-witness disclosure deadline were (1) inadequate financial resources, and (2) the state's and the OMI's failure to provide him with autopsy photographs. [Id.; Exh. F at 5].  Mr. Mitchell submits that he "brought Dr. Griest back into the trial *only* after Dr. McFeeley . . . went far beyond the autopsy report . . . and gave opinions which were contradicted by the medical literature and would have been contradicted by . . . Dr. Griest." [Id.; Exh. F at 5 (emphasis in original)].  According to Mr. Mitchell, Dr. Griest's testimony was "absolutely critical" [see id.; Exh. D at 42] because, through it, Dr. Griest would have exposed the state's theory of the case as "implausible, improbable and certainly not likely." [Id.; Exh. F at 10].

29

Mr. Mitchell insists that (1) exclusion of Dr. Griest's testimony was not harmless; (2) the state was not surprised or prejudiced by the late disclosure; and (3) Mr. Mitchell's late disclosure was not done as a tactic or in bad faith. [Doc. 10 at 10].

The New Mexico Supreme Court rejected Bryant's argument and concluded that, under the circumstances, Dr. Griest's exclusion was not a violation of Bryant's Sixth Amendment right to call witnesses on his behalf. [Doc. 7; Exh. G at 20].  The supreme court found that (1) on the day jury selection was to begin, Mr. Mitchell told the trial court and the state's attorney that he sent autopsy photographs and reports to only one of his several potential expert witnesses and did not know which one he intended to call; (2) because Dr. Griest had been disclosed only one week earlier, the state moved to exclude her; (3) Mr. Mitchell told the trial court that "both Dr. Griest and Dr. Doberson were pathologists with the same expertise on the issue of the age of a corpse;" [id.; Exh. G at 21]; (4) the trial court told Mr. Mitchell that unless he could give a reason that Dr. Griest should not be excluded, the court was going to strike her as a witness; and (5) Mr. Mitchell did not respond to the trial court. [Id.; Exh. G at 21].

The supreme court also found that Dr. McFeeley testified on September 23, 1999, and that on September 27, 1999, with only Bryant remaining to take the stand, Mr. Mitchell sought reconsideration of the trial court's order striking Dr. Griest on the ground that Dr. Doberson was unavailable to testify on such short notice, but Dr. Griest was able to appear.  [Doc. 7; Exh. G at 20]. The court further found that, in response, the state's attorney informed the trial court that the state contacted Dr. Doberson *before* Dr. McFeeley took the stand on September 23, and that Dr. Doberson "was already aware that defense counsel would not be calling him to testify[,]" leading the state to conclude that Mr. Mitchell knew he would not be calling Dr. Doberson but waited until as late as September 27 to renew his request that Dr. Griest be allowed to testify.  [Id. 7; Exh. G at 21].

The trial court denied Mr. Mitchell's renewed request to call Dr. Griest, which the supreme court deemed justified in light of Mr. Mitchell's actions in (1) not disclosing Dr. Griest until one week before trial; (2) not sending her relevant evidence for review; and (3) dismissing Dr. Doberson as he did.  [Doc. 7; Exh. G at 22].   Noting that the trial court concluded that Mr. Mitchell (1) created a situation of unavailable experts by calling off Dr. Doberson when he knew Dr. Griest was stricken, and (2) essentially orchestrated this "scenario" in an attempt to manufacture an issue for appeal, the supreme court held that the trial court did not commit an abuse of discretion in ruling as it did with respect to Dr. Griest.

The Sixth Amendment to the United States Constitution provides, in pertinent part, that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have compulsory process for obtaining witnesses in his favor. . . ."  U.S. CONST. amend VI.   The Supreme Court explained the origin and nature of the fundamental right to present witnesses:

> The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies.  Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law.

Washington v. Texas, 388 U.S. 14, 18 (1967).  Moreover, "[t]he right of an accused to have compulsory process for obtaining witnesses in his favor stands on no lesser footing than the other Sixth Amendment rights that [the high court has] previously held applicable to the States."   Id.

Notwithstanding that "[f]ew rights are more fundamental than that of an accused to present witnesses in his own defense[,]" see Chambers v. Mississippi, 410 U.S. 284, 302 (1973), the right is not absolute, and the exclusion of evidence in a criminal trial will be said to have abridged a

defendant's right to present a defense only where the exclusion is arbitrary or disproportionate to the purpose it is designed to serve. Forensic v. Birkett, 501 F.3d 469, 475 (6th Cir. 2007). In other words, the right to present relevant testimony may, under proper circumstances, "bow to accommodate other legitimate interests in the criminal trial process." Rock v. Arkansas, 483 U.S. 44, 55 (1987); Michigan v. Lucas, 500 U.S. 145, 149 (1991). The integrity and efficient administration of judicial proceedings constitute such countervailing interests. Young v. Workman, 383 F.3d 1233, 1237-38 (10th Cir. 2004).

Accordingly, "[e]xcluding witnesses for failure to comply with discovery orders, if not an abuse of discretion, does not violate a defendant's Sixth Amendment right to compulsory process." United States v. Russell, 109 F.3d 1503, 1509 (10th Cir. 1997) (citing Taylor v. Illinois, 484 U.S. 400 (1988)). The reasoning for such a rule may be understood by considering the nature of an accused's right to present evidence and witness testimony in his defense: whereas other rights protected by the Sixth Amendment "arise automatically on the initiation of the adversary process[,]" Taylor, 484 U.S. at 653, the right to compel witness testimony rests solely with the defendant, the effective use of which requires that it "be preceded by deliberate planning and affirmative conduct." Id. at 653-654. It is the need to safeguard the integrity of the adversary system, as well as public confidence in that system, that both undergirds and limits the defendant's right to present exculpatory evidence:

> The adversary process could not function effectively without adherence to rules of procedure that govern the orderly presentation of facts and arguments to provide each party with a fair opportunity to assemble and submit evidence to contradict or explain the opponent's case. The trial process would be a shambles if either party had an absolute right to control the time and content of his witnesses' testimony[, therefore t]he State's interest in the orderly conduct of a criminal trial is sufficient to justify the imposition and enforcement

> of firm, though not always inflexible, rules relating to the identification and presentation of evidence.

Id. at 654.  Thus, where non-compliance with a discovery order vis-à-vis witness disclosure is "willful and motivated by a desire to obtain a tactical advantage . . ., it would be entirely consistent with the purposes of the Compulsory Process Clause simply to exclude the witness' testimony." Id. at 656; accord Young, 383 F.3d at 1239.

In this case, Mr. Mitchell both (1) untimely disclosed Dr. Griest as an expert witness, and (2) called off Dr. Doberson *before* Dr. McFeeley took the stand, knowing that the trial court struck Dr. Griest.   The trial court specifically found that Mr. Mitchell was responsible for creating this situation of unavailable experts.

On appeal, the New Mexico Supreme Court laid out the relevant timeline as follows:

August 30, 1999:     Mr. Mitchell discloses Dr. Griest as an expert witness.

September 7, 1999:   Jury selection begins.  Trial court holds status conference during which state moves to strike Dr. Griest because she was added as a witness only one week before trial.  Mr. Mitchell advises that he sent autopsy report and photographs to one of his several potential expert witnesses but was unsure which expert he was going to call.  Dr. Mitchell informs that Drs. Griest and Doberson are both pathologists with the same expertise on the issue of aging a corpse.   Receiving no response from Mr. Mitchell as to why Dr. Griest should not be excluded, the trial court strikes her as an expert witness.

September 23, 1999:  Dr. McFeeley testifies.

September 27, 1999:  Mr. Mitchell seeks reconsideration of the trial court's order striking Dr. Griest, explaining that Dr. Doberson now is unavailable to testify but that Dr. Griest is available.  The state's attorney informs the trial court that she contacted Dr. Doberson *prior* to September 23, 1999, and at that time Dr. Doberson was already aware that Mr. Mitchell was not going to call him as a witness.

[Doc. 7; Exh. G at 21].

Reviewing for an abuse of discretion, the supreme court noted that the trial court explained that it initially excluded Dr. Griest because she was disclosed late and, as a result of the untimely disclosure, the state did not have the opportunity to learn the substance of her testimony because as of that time, she had not yet reviewed any of the relevant evidence. [Doc. 7; Exh. G at 22]. Secondly, the trial court expressed concern, upon Mr. Mitchell's request that it reconsider its order to strike, as to why Dr. Doberson became unavailable once trial was underway, concluding that Mr. Mitchell created the situation of unavailable experts so as to manufacture "an issue to claim that either the State or the judge denied Defendant the ability to call an expert on a critical issue." [Id.; Exh. G at 22].

The supreme court affirmed the trial court's exclusion of Dr. Griest, holding that the exclusion did not work a violation of Bryant's Sixth Amendment right to call witnesses on his behalf, and that the trial court did not abuse its discretion in striking her.  Instead, the circumstances were such that the trial court's action was appropriate and justified:

> Defense counsel's actions of not listing Dr. Griest until the week before trial, not sending her the relevant evidence for review and dismissing his other expert, Dr. Doberson, ultimately justified the sanction imposed.  The trial court's comments, as a whole, evidence concerns about the impact of defense counsel's tactics on the case, the integrity of the trial process, and the efficient administration of justice.  Defense counsel was fully able to cross-examine the State's expert witness regarding time of death, the autopsy report, and her opinions and conclusions.  Defendant did call his own expert, Dr. Haskell, on the issue of time of death.  The limitation of the defense to one expert on the time of death is not an unreasonable sanction in light of defense counsel's improper actions.  Accordingly, there is no abuse of discretion in the trial court's actions with respect to Dr. Griest.

[Doc. 7; Exh. G at 22].

Having concluded that Mr. Mitchell contrived the "scenario" of the unavailable experts in an attempt to create an issue whereby he could then claim that either the state or the trial court denied him his constitutional right to call witnesses to testify on Bryant's behalf, the trial court clearly found that counsel's actions with respect to Dr. Griest and Dr. Doberson were both willful and motivated by a desire to gain a tactical advantage, notwithstanding that the court may not have used those precise words.  See Young, 383 F.3d at 1240 ("We do not require the trial court to use the word 'willful' if the record clearly reflects the court's belief that counsel's violation . . . was indeed willful.").

The fact that remains that, had Mr. Mitchell not inexplicably called him off, Bryant did indeed have at his disposal an expert witness in the field of forensic pathology—Dr. Doberson. Once again, in response to questioning by the trial court, Mr. Mitchell advised that Drs. Griest and Doberson were both pathologists with the same expertise when it came to trying to age bodies.  [See Doc. 13; record of proceedings in State v. Bryant, No. SF 98-588 CR, "Status Conference" of 9/7/1999 at 23-24].[6]  Yet even before the court took testimony from Dr. McFeeley who, according to Mr. Mitchell, testified so far beyond the findings contained in the autopsy report that it was critical to have another competent pathologist provide rebuttal testimony, he had called off Dr. Doberson.  Tellingly, nowhere in his (1) brief-in-chief to the New Mexico Supreme Court; (2) reply to the state's answer to that brief; (3) federal petition for *habeas* corpus; or (4) reply to the state's

---

[6]  To be sure, before trial began, the court specifically questioned Mr. Mitchell as to whether there was anything the court did not know about Dr. Doberson, such as "[i]s he unavailable? *Is he not going to be here*? Does he have a different area of expertise other than [Dr. Griest]?"  [Doc. 13; record of proceedings in State v. Bryant, No. SF 98-588 CR, "Status Conference" of 9/7/1999 at 23 (emphasis added)].  Mr. Mitchell replied, "They're both pathologists, that's all I can tell you, Your Honor, is that they're both pathologists and they have the same expertise as far as I know when it comes to trying to age bodies."  [Doc. 13; record of proceedings in State v. Bryant, No. SF 98-588 CR, "Status Conference" of 9/7/1999 at 23-24].

answer to that petition does Mr. Mitchell address the fact that, even before Dr. McFeeley took the stand, Mr. Mitchell already advised Dr. Doberson that he would not be called. [See Doc. 1 at 33-34; Doc. 7; Ex. D at 44-53 and Exh. F at 4-13; Doc. 10 at 7-10].  Mr. Mitchell called off Dr. Doberson even though (1) establishing Ms. Baca's time of death was a critical issue in the case; (2) the trial court struck Dr. Griest as a witness; and (3) Mr. Mitchell himself represented that Drs. Doberson and Griest possessed the same expertise when it came to trying to aging bodies.

Willful misconduct employed to gain a tactical advantage will support the exclusion of evidence or witness testimony, notwithstanding a defendant's right to compulsory process under the Sixth Amendment.  See, e.g., Taylor, 484 U.S. at 656-658 (counsel's failure to disclose witness in accordance with discovery rule was blatant and willful and justified sanction of witness' exclusion); United States v. Hardy, 586 F.3d 1040, 1043-46 (6th Cir. 2009) (exclusion of evidence as sanction for discovery violation did not violate defendant's Sixth Amendment rights where counsel's explanation as to why he purposefully withheld from government the evidence in question indicated that counsel was motivated by attempt to gain advantage at trial); Chappee v. Vose, 843 F.2d 25, 27-32 (1st Cir. 1988) (preclusion of three expert witnesses as sanction for counsel's failure to disclose their names in timely fashion did not violate defendant's Sixth Amendment rights where trial court specifically found that counsel deliberately withheld names from government and did not act in good faith).  Under the particular circumstances, this Court is unable to conclude that the state supreme court engaged in an unreasonable application of federal law.

**Ground Three: The trial court erred in admitting the expert testimony of Philip Avilas on
percentages of hair transfer in sex crimes**

Bryant next contends that the trial court erred in admitting testimony of Philip Avilas, the
state's expert forensic microanalyst, on percentages of hair transfer in sex-crimes cases because this
testimony did not meet the standards set forth in <u>Daubert v. Merrell Dow Pharmaceuticals</u>, 509 U.S.
579 (1993).  [Doc. 1 at 34-35; Doc. 10 at 10-11].    Avilas testified that trace evidence, including
hair, was found on Ms. Baca's body, as well as on her clothing and on the blanket and rug in which
she was wrapped.  [Doc. 13; record of proceedings in <u>State v. Bryant</u>, No. SF 98-588 CR, Vol. V
at 54-65].  Bryant argues that Avilas should not have been allowed to testify that, in his experience,
he was able to detect the transfer of pubic hair during sexual contact less than 1/2 of 1 percent of the
time, and that the scientific literature "somewhat" agreed with his numbers.  [Doc. 10 at 10-11; <u>see
also</u> Doc. 13; record of proceedings in <u>State v. Bryant</u>, No. SF 98-588 CR, Vol. V at 68-69].  Bryant
objected to this testimony at trial on the ground that Avilas "was not a statistician and that he was
speculating, guessing and conjecturing based on his limited experience and that an inadequate
amount of study had been done in order for it to be reliable." [Doc. 7; Exh. D at 54].  The trial court
overruled the objection.

Bryant raised this issue on appeal to the New Mexico Supreme Court, which held that the
trial court did not abuse its discretion in admitting the testimony about transfer percentages.  The
court concluded that Avilas's testimony was based upon his personal experience investigating  sex-
crimes cases, and that any lack of expertise in statistics went to the weight of his testimony and
therefore was for the jury to consider and assess. [Doc. 7; Exh. G at 22-24].  Avilas's "personal
experience," continued the court, comprised 14 years as an investigator in sex-crimes cases, during
which he "worked on approximately 250 sex crimes cases a year. . . ." [<u>Id.</u>; Exh. G at 23].

In Daubert, the United States Supreme Court held that Rule 702 of the Federal Rules of Civil Procedure, which controls the admission of expert testimony, compels courts to perform the critical "gatekeeping" function concerning the admissibility of expert scientific and technical evidence. Daubert, 509 U.S. at 589-590 and n.7.  The rationale for demanding that a court fulfill its role as gatekeeper derives from the potential power of testimony when presented by an expert:

> Indeed, no other kind of witness is free to opine about a complicated matter without any firsthand knowledge of the facts in the case, and based upon otherwise inadmissible hearsay if the facts or data are "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject."

United States v. Frazier, 387 F.3d 1244, 1260 (11th Cir. 2004) (quoting Fed.R.Civ.P. 703). Accordingly, the purpose of the gatekeeping requirement is to ensure the reliability and relevancy of expert testimony, and also to "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 152 (1999).

It is possible, however, for the same witness to provide both lay and expert testimony in a single case.  Indeed, a witness need not testify as an expert simply because he is an expert; rather, the nature and object of the testimony determine whether the procedural protections of Rule 702 apply.  United States v. Caballero, 277 F.3d 1235, 1247 (10th Cir. 2002).  Thus, in this case, where Philip Avilas first explained that he worked on approximately 250 sex-crimes cases per year for the past 14 years, his testimony that "*in his experience and investigations*, [hair transfers from offender to victim] took place in less than one-half of one percent of all sex crimes *in which he examined evidence*[]" [Doc. 7; Exh. G at 23 (emphasis added)] "proffered no opinion, lay or expert, but simply [his] personal experience relating to a subject bearing directly upon the appropriateness of a jury

inference[.]" <u>Caballeros</u>, 277 F.3d at 1247.  Subsequent testimony from Avilas regarding the existence of scientific literature on the subject agreeing with what he observed merely highlighted a similarity between that literature and his investigations.  By expressing "a statement of fact as to what [he] had witnessed during [his] career[,]" <u>id.</u>, Avilas provided no opinion but, instead, gave the jurors a basis or foundation from which they could draw their own reasonable inferences and/or conclusions.

In this sense, the facts of the instant case stand in contrast to those existing in <u>United States v. Frazier</u>, a kidnaping/sexual-assault case where the Eleventh Circuit held that the district court did not abuse its discretion in preventing defendant's expert forensic investigator, Robert Tressel, from testifying that "[w]ith the amount of sexual activity described in the search warrant affidavit, it would be expected that some transfer of . . . hair[] . . . would occur in this case."  <u>United States v. Frazier</u>, 387 F.3d 1244, 1254 n.10 (11th Cir.  2004).

During a <u>Daubert</u> hearing on Mr. Tressel's qualifications, the government questioned him as to his proffered opinions that (1) hair was the most common form of forensic evidence found in rape investigations; and (2) "it would be expected that some transfer of either hairs or seminal fluid would occur."   <u>Frazier</u>, 387 F.3d at 1253.  However,

> [w]hen asked to clarify what in his experience provided a more specific foundation for his general opinions, Tressel identified a single investigation he had worked on, in which hair evidence was recovered during the investigation of a serial rapist. He cited to no other case or investigation, and made no effort to quantify in any way the number of cases he was personally involved in that showed a transfer of hair or seminal fluid.
> . . .
>
> Tressel also observed that "I don't think anybody has ever studied the rates of transfer" of hair evidence, and clarified that he was not familiar with any scientific literature on the rate of transfer of hair in sexual assault cases.

39

Id.

As a result, Mr. Tressel was qualified to testify as an expert on standard procedures employed in investigating a sexual-assault crime scene, and would also have been[7] permitted to testify that no hair or fluid matching that of the defendant was found on the scene, notwithstanding that his expert opinion that the forensic evidence most commonly found during the analysis of a rape investigation is the transfer of hairs.  Frazier, 387 F.3d at 1254.  He would not, however, have been allowed to opine that, based on the victim's recounting of the sexual assault, it would have been expected that the transfer of hair (or seminal fluid) would have occurred.  Id.  The reason was lack of reliability:

> The trial court said that while Tressel was generally qualified as an expert forensic investigator, he had not provided any specific basis—quantitative, empirical or otherwise—for his opinions. Precisely because Tressel could not specify in what percentage of cases hair or fluid evidence might reasonably be expected to be recovered, his opinion that the recovery of such evidence "would be expected" would mislead the jury. Simply put, there was no basis for assessing the reliability of Tressel's opinion of what might reasonably be expected, or even its exact meaning.

Id. at 1255.

The defendant *did* call Karen Lanning, an FBI hair and fiber examiner, who testified that she analyzed, among other things, hair and clothing collected during the investigation, and that none of the hairs recovered matched those of the defendant.  Frazier, 387 F.3d at 1256.  On cross-examination and over the defendant's objection, Agent Lanning was permitted to testify that she found hair transfers in 10% of the cases she worked on, and found no hair 90% of the time.  Because

---

[7] In the end, the defendant opted not to call Mr. Tressel at all.  See Frazier, 387 F.3d at 1256.

she was called as a fact witness, Agent Lanning was not allowed to testify as to "the significance of finding no hair in the case[.]"   Id.

The government then called Agent Lanning as a rebuttal witness.  After being qualified as an expert in the field of hair analysis, Agent Lanning testified extensively on studies detailing the percentage of hair transfers in sexual-assault cases, and also clarified her earlier 10% figure, "specifying that hair was only recovered in between 2% and 5% of the *rape* cases she worked on." Frazier, 387 F.3d at 1257 (emphasis in original).

In affirming the district court's striking of Mr. Tressel while allowing the testimony of Agent Lanning, the Eleventh Circuit returned to the reliability of the opinions, explaining that, as an initial matter, "the very meaning of" Mr. Tressel's proffered opinion that hair transfer "would be expected" under the circumstances was uncertain.  Frazier, 387 F.3d at 1265.  The court continued:

> More fundamentally, even if we take Tressel's opinion to mean simply that it was more likely than not that hair or seminal fluid would be transferred, and therefore recovered, Tressel offered precious little in the way of a reliable foundation or basis for his opinion. After the government moved to exclude Tressel's expert testimony, the district court was obliged to exercise its gatekeeping role by determining whether Tressel provided a reliable foundation or basis for his opinion. When questioned specifically about the basis for his opinion, Tressel said his opinion was based on his experience, and on various texts in forensic investigation. However, even after repeated prompting, Tressel never explained just how his own experience, or the texts he mentioned, supported his "expectancy" opinion. Indeed, Tressel identified only a single investigation he had worked on in which hair evidence was recovered during the investigation of a serial rapist, and could suggest no study that had ever examined the rate of transfer of hair in sexual assault cases.

Id.

Returning to the facts of Bryant's case, this Court's point in comparing the expert-witness issue here to the one that arose in Frazier is to illustrate that, in allowing Philip Avilas to testify as

41

to the number of hair transfers that occurred in sex-crimes cases in which he examined evidence, the trial court did nothing more than permit him to make a statement of fact as to what he had witnessed over the course of his career.  See Caballero, 277 F.3d at 1247.  The jury was free to use that personally acquired information as a foundation to reach a conclusion as to what, if anything, was significant about the discovery of hair on Ms. Baca, her clothing, and the blanket and rug in which she was wrapped.  By contrast, in Frazier, the problem was just the opposite: Robert Tressel's attempt to tell the jury, on the basis of nothing he could quantify, what should have happened if, as the victim claimed, she was sexually assaulted by the defendant.  Frazier, 387 F.3d at 1265.

Accordingly, to the extent that Philip Avilas offered testimony on numbers and percentages of hair transfers in sex-crimes cases in which he examined evidence, "the challenged testimony proffered no opinion, lay or expert, but simply [Avilas's] personal experience relating to a subject bearing directly upon the appropriateness of a jury inference."  Caballero, 277 F.3d at 1247. Daubert is, therefore, inapplicable here, and Bryant is entitled to no relief on the claim asserted in ground three of his petition.

### Ground Four: The trial court erred in admitting evidence concerning Bryant's relationships with his girlfriend and his neighbors

As the basis for his fourth ground for federal relief, Bryant contends that he was denied a fair trial, in violation of his rights under the Fifth and Fourteenth Amendments, as a result of the state having "called several witnesses who talked about [Bryant] having arguments with his girlfriend, interfering with neighbor's parking spots and playing loud music." [Doc. 10 at 11-12].  Bryant argues that this evidence was irrelevant, immaterial, and prejudicial. [Id. at 11].  Although Bryant raised this issue on direct appeal to the New Mexico Supreme Court, that court addressed only the argument that the trial court erred in admitting evidence related to disagreements Bryant had with

others over his assigned parking spot. [Doc. 7; Exh. G at 24].  The supreme court noted that, at trial, Bryant did not object to testimony on the topic of his relationships with his girlfriend and his landlady and, therefore, those arguments were not preserved for appeal. [Id.; Exh. G at 24].

The New Mexico Supreme Court affirmed the trial court on this point.  The court reasoned that because Bryant sought to prove at trial that his pickup truck was largely inoperable, testimony concerning his agitation over others parking in his assigned spot was relevant to show that the "vehicle was sometimes functional and being driven by [Bryant]." [Doc. 7; Exh. G at 24].  The court also concluded that, "[i]n addition to being relevant, there [was] no credible allegation that [Bryant] was prejudiced by the introduction of this evidence." [Id.; Exh. G at 24].

It has long been established that the Due Process Clause of the Fourteenth Amendment "guarantees the fundamental elements of fairness in a criminal trial."  Spencer v. State of Tex., 385 U.S. 554, 563-564 (1967); see also Massey v. Moore, 348 U.S. 105, 108 (1954) ("The requirement of the Fourteenth Amendment is for a fair trial.").[8]  At the same time (and as previously explained), federal *habeas* courts do not, as a general matter, sit to review state-law questions about the admissibility of evidence.  See Wilson, 536 F.3d at 1101.  On the other hand, there may exist instances where the erroneous admission of evidence "so infused the trial with unfairness as to deny due process of law."  Lisenba v. California, 314 U.S. 219, 228 (1941).  To rise to that level of

---

[8]  As the Tenth Circuit has explained:

> The denial of a fair and impartial trial, as guaranteed by the 6th Amendment to the Constitution, is also a denial of due process, demanded by the 5th and 14th Amendments, and the failure to strictly observe these constitutional safeguards renders a trial and conviction for a criminal offense illegal and void and redress therefor is within the ambit of habeas corpus.

Baker v. Hudspeth, 129 F.2d 779, 781 (10th Cir. 1942).

unfairness, however, the evidence in question must be "so extremely unfair that its admission violates fundamental conceptions of justice." Sims v. Stinson, 101 F.Supp.2d 187, 194 (S.D.N.Y. 2000) (internal quotations omitted). To put it differently, "a federal court on habeas review will not disturb the state court's evidentiary ruling unless it was 'so grossly prejudicial that it fatally infected the trial and denied the fundamental fairness that is the essence of due process." Wilson, 536 F.3d at 1102 (quoting Fox v. Ward, 200 F.3d 1286, 1296 (10th Cir.2000)).

"Inquiry into fundamental fairness requires examination of the entire proceedings, including the strength of the evidence against the petitioner . . . at . . . trial. . . ." Parker v. Scott, 394 F.3d 1302, 1311 (10th Cir. 2005) (internal quotations omitted). In conducting the "fundamental fairness" inquiry, it is not this Court's place to second guess a state court's application or interpretation of state law unless such application or interpretation violates federal law as set forth by the United States Supreme Court. Bowser v. Boggs, 20 F.3d 1060, 1065 (10th Cir. 1994). Indeed, "an absolute prerequisite for [Bryant's] claim is that the asserted constitutional right on which it rests derive in clear fashion from Supreme Court precedent." Carter v. Ward, 347 F.3d 860, 863 (10th Cir. 2003).

In support of his claim that the trial court erroneously admitted testimony that was irrelevant, immaterial, and prejudicial, Bryant cites to (1) Dowling v. United States, in which the United States Supreme Court established the general principle that evidence that "is so extremely unfair that its admission violates fundamental conceptions of justice" may violate due process, Dowling v. United States, 493 U.S. 342, 353-353 (1990); and (2) Williams v. Taylor, in which the Court noted that "errors that undermine confidence in the fundamental fairness of the state adjudication certainly justify the issuance of the federal writ" of habeas corpus. Williams v. Taylor, 529 U.S. 362, 376 (2000). However, as the high court made clear in Dowling, "[b]eyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation. [The Court],

44

therefore, ha[s] defined the category of infractions that violate 'fundamental fairness' very narrowly." Id. at 352.  Perhaps for this reason, "[t]he Supreme Court has made very few rulings regarding the admission of evidence as a violation of due process [and] has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ." Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009); accord Adams v. Jacquez, 2011 WL 3563158, at *21 (E.D.Cal. Aug. 11, 2011).  Absent such a ruling from the Supreme Court, a federal *habeas* court cannot find the state court's ruling to have been an "unreasonable application" of "clearly established federal law" under 28 U.S.C. § 2254(d)(1).  See Carey v. Musladin, 549 U.S. 70, 77 (2006).

### Ground Five: The trial court erred in denying Bryant's motion for mistrial made after the prosecutor made comments touching upon Bryant's constitutional right to remain silent

Emphasizing that he has a Fifth Amendment right to remain silent, Bryant next contends that he was denied that right when the prosecutor, during closing argument, commented on a second set of keys to Bryant's pickup truck.  The prosecutor remarked that, while Bryant testified at trial to the keys' existence, he never complained, after reviewing the inventory done on his pickup, that those keys were not listed or returned to him.  The existence of this second set of keys was important to Bryant's defense that the drug dealers he encountered on the night he was with Ms. Baca at the Bow and Arrow Lodge used those keys to open his camper shell and place Ms. Baca's body in Bryant's truck.

Bryant raised this issue on direct appeal to the New Mexico Supreme Court, which held that, "[w]ithout doubt, the constitutional privilege against self-incrimination forbids comment by a prosecutor on the right of an accused to remain silent at trial." [Doc. 7; Exh. G at 29].  However, continued the court, "the fact that an accused omits details in his statement is not the type of silence

45

which is constitutionally protected, as the accused does not remain silent with respect to the subject matter of his statement." [Id.; Exh. G at 29]. The supreme court determined that the prosecutor's comments did not concern Bryant's silence between his arrest on February 20, 1998 and the discovery of Ms. Baca's body early in March; instead, the prosecutor was remarking on Bryant's trial testimony during which "he stated he told the inventorying officer not to forget his keys and his further testimony that he noticed only one set of keys in inventory at his booking." [Id.; Exh. G at 29]. Accordingly, concluded the court, the trial court committed no abuse of discretion in denying Bryant's motion for mistrial.

The Fifth Amendment to the United States Constitution provides, in pertinent part, that "[n]o person shall be . . . compelled in any criminal case to be a witness against himself. . . ." U.S. CONST. amend V. The United States Supreme Court has held that the Fifth Amendment "forbids . . . comment by the prosecution on the accused's silence . . . that such silence is evidence of guilt." Griffin v. California, 380 U.S. 609, 615 (1965). For this reason, Griffin, as well as the privilege against self-incrimination, are violated "when a prosecutor uses language which is manifestly intended to be a comment on the defendant's failure to testify or of such character that the jury would naturally and necessarily take it to be such a comment." United States v. Rahseparian, 231 F.3d 1267, 1273 (10th Cir. 2000) (internal quotations omitted).

Subsequent to Griffin, the Supreme Court, in Doyle v. Ohio, held that the use for impeachment purposes of an accused's silence at the time of arrest and after receiving Miranda[9] warnings, violates the Due Process Clause of the Fourteenth Amendment. Doyle v. Ohio, 426 U.S. 610, 619 (1976). The rule announced in Doyle was "based upon a recognition that it is

_____

[9] Miranda v. Arizona, 384 U.S. 436, 467-473 (1966).

fundamentally unfair for the government to inform a defendant of his right to remain silent and then ask at trial that a negative inference be drawn from that silence." United States v. Canterbury, 985 F.2d 483, 486 (10th Cir. 1993). Yet Doyle is not violated by cross-examination during which the prosecution calls attention to the fact that the defendant's trial testimony differs from a statement made at the time of arrest. See Anderson v. Charles, 447 U.S. 404, 408 (1980). The distinction is that, in the Anderson-type situation, "[s]uch questioning makes no unfair use of silence because a defendant who voluntarily speaks after receiving Miranda warnings has not been induced to remain silent. As to the subject matter of his statements, the defendant has not remained silent at all." Id. Additionally, rather than attempt to draw any sort of meaning from the defendant's "silence" ("silence" in this sense being used to mean that, in making a pre-trial statement, the defendant omits a detail he later recounts at trial), the questioning permitted by Anderson aims to elicit an explanation for the prior inconsistent statement. See id. at 409.

In this case, after Bryant testified to the existence of a second set of keys, the prosecutor (1) commented during closing argument that even though the inventory of his pickup truck listed only one set of keys, Bryant made no complaint that not all his property was returned to him; and (2) made a second reference to Bryant's failure to mention a second set of keys while speaking to the police and the tow truck driver. After both comments, Bryant unsuccessfully moved for a mistrial, although the trial judge gave a curative instruction following the first comment. On appeal, the New Mexico Supreme Court considered the prosecutor's comments in context, and concluded that they were not in reference to Bryant's post-arrest silence but, rather, "*in response* to [Bryant's] trial testimony in which he stated he told the inventorying officer not to forget his keys and further testimony that he noticed only one set of keys in inventory at his booking." [Doc. 7; Exh. G at 29 (emphasis added)].

47

Because the Fifth Amendment protects against *compulsory* self-incrimination, comments made by the prosecution must be examined in context, and there is no violation where the prosecutor merely makes reference to the defendant's silence in "fair response" to a claim made by the defendant himself (or the defendant's attorney). United States v. Robinson, 485 U.S. 25, 32-33 (1988); accord United States v. Ivory, 532 F.3d 1095 (10th Cir. 2008). As the reviewing court, the New Mexico Supreme Court properly determined that, in the context in which they were made, the prosecutor's comments were in response to Bryant's trial testimony. The court also noted that, in speaking to the inventorying officer and the tow truck driver Bryant "d[id] not remain silent with respect to the subject matter of his statement[]" in the first instance. [Doc. 7; Exh. G at 29]. In so doing, the state supreme court relied on the precise reasoning leading to the rule announced by the United States Supreme Court in Anderson. The decision of the New Mexico Supreme Court, therefore, was not contrary to, nor did it involve an unreasonable application of, clearly established federal law as determined by the United States Supreme Court. Neither was the state decision based on an unreasonable determination of the facts in light of the evidence presented. See Welch, 639 F.3d at 991. Bryant is entitled to no relief with respect to ground five of his petition.

**Ground Six: The cumulative error resulting from the errors asserted in grounds one through five was so prejudicial as to deprive Bryant of his fundamental right to a fair trial**

For his final ground for federal relief, Bryant maintains that "[t]he amount of error in the case of State v. Robert L. Bryant was so cummulative [sic] that it denied him a fair and impartial trial." [Doc. 1 at 38-39; Doc. 10 at 12-13]. This issue was raised on direct appeal and addressed by the New Mexico Supreme Court, which concluded that the record as a whole supported that Bryant received a fair trial, and that where there is no error, the "cumulative error" doctrine does not apply. [Doc. 7; Exh. G at 29-30].

48

"The right to a fair trial is a fundamental liberty secured by the Fourteenth Amendment."

Estelle v. Williams, 425 U.S. 501, 503 (1976).  Sometimes, though, the cumulative effect of multiple

errors may be so prejudicial as to deny the defendant a fair trial.  United States v. Thomas, 62 F.3d

1332, 1343 (11th Cir. 1995).  In such a case, the court applies a "cumulative error" analysis whereby

it aggregates all errors found to be harmless and analyzes whether their cumulative effect on the

outcome of the trial is such that collectively they can no longer be determined to be harmless.

Welch v. Workman, 639 F.3d at 1016.  Finally, a "cumulative error" analysis evaluates only the

effect of matters determined to be error, not the cumulative effect of non-errors.  Caballero, 277 F.3d

at 1250.

In this case, the New Mexico Supreme Court concluded that (1) Bryant received a fair trial;

(2) the trial court committed no error; and (3) the "cumulative error" doctrine was, therefore,

inapplicable. [Doc. 7; Exh. G at 29-30].  These conclusions are not contrary to, nor do they involve

an unreasonable application of, clearly established federal law as determined by the United States

Supreme Court, and they similarly are not based on an unreasonable determination of the facts in

light of the evidence presented.  See Welch, 639 F.3d at 991.

## Conclusions and Recommended Disposition

For the foregoing reasons, the Court finds that *habeas* relief is not warranted on Bryant's

claims.  Bryant has failed to establish that the adjudication of his claims on the merits in the state

court proceedings resulted in a decision that was contrary to, or involved an unreasonable

application of, clearly established federal law, as determined by the United States Supreme Court,

or that the decision was based on an unreasonable determination of the facts in light of the evidence

presented in the state court proceedings.  See 28 U.S.C. § 2254(d)(1)-(2).

Accordingly, the Court recommends that Robert Bryant's *Petition Under 28 U.S.C. § 2254*

*for Writ of Habeas Corpus by a Person in State Custody* [Doc. 1] be **DENIED** and that this case be

**DISMISSED with PREJUDICE**.

*Lorenzo F. Garcia*                    9/26/2011
_____
Lorenzo F. Garcia
United States Magistrate Judge

50